❒ Original          ❒ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No. 22-1812M(NJ) |
| A silver Apple iPhone 13, serial number 35981126362905, | ) |
| currently located at the North Central High Intensity Drug | ) |
| Trafficking Area, 801 West Michigan Street, Milwaukee, | ) |
| Wisconsin | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 11/23/2022 _____ *(not to exceed 14 days)*
❒ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for _30_ days *(not to exceed 30)*   ❒ until, the facts justifying, the later specific date of _____ .

Date and time issued: 11/9/2022 @ 2:55 p.m. _____

*Judge's signature*

City and state:  Milwaukee, Wisconsin _____      Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched is a silver Apple iPhone 13, serial number 35981126362905, hereinafter "**the Device**," which is currently located at North Central High Intensity Drug Trafficking Area, 801 West Michigan Street, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **the Device** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1.      All records on **the Device** described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(l) (distribution of controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy), 18 U.S.C. § 1035 (false statements regarding health care offenses), 18 U.S.C. § 1347 (health care fraud), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), and involve Phillip DANIELS, including, but not limited to:

   a.   Lists of drug customers and related identifying information;

   b.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c.   Any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

   d.   Any information recording schedule or travel;

   e.   All bank records, checks, credit card bills, account information, and other financial records;

   f.   Photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking or money laundering;

   g.   Any evidence related to either the ownership, purchase, or possession of drugs, firearms, and assets;

   h.   Personal or supportive care client files, including but not limited to the complete client files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical

forms, treatment plans, referrals, consultations, correspondence, client contracts, client information, demographic information, and certificates of medical necessity;

i. Records reflecting any polices or procedures of the businesses/agencies, including but not limited to billing and training policies and procedures;

j. Records or other evidence of client complaints, allegations of substandard care and performance, and unnecessary services performed by representatives, employees and agents of the agencies;

k. Records related to employees, consultants, and personnel including but not limited to resumes, application forms, licenses, job descriptions, time sheets, employment agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former owners, officers, employees and independent contractors.

l. Communications in any form involving current and former business/agency owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial services providers, potential or actual clients, insurance companies, consultants, or government entities to the extent the communications may relate to the crimes under investigation. This includes communications between any employees of the agency and the agency itself and communications between and among any of the entities referred to herein.

m. Audio or video recordings, stored in any format, of communications between, or statements of, current and former business/agency owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial service providers, potential or actual clients, and consultants;

n. Contracts with any current or former clients, vendors, affiliates, referral sources, independent contractors, or consultants;

o. Records that tend to show the activities, location, or compensation of current and former agency owners, officers, employees, independent contractors, consultants, or referral sources, including calendars, schedules, appointment books, timesheets, or address books;

compensation agreements and payments; or documentation related to purchase or other transfer of assets;

p. Corporate records, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities;

q. Financial records reflecting the earnings, income, profits, and assets of the businesses/agencies and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors;

r. Cash, money orders, or other forms of payment, stored in any location, which represents proceeds from the illegal conduct described herein;

s. Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment);

t. Records identifying other locations where the businesses/agencies may maintain financial, medical, and billing records, such as additional office space or storage units;

u. All bank records, checks, credit card bills, account information, and other financial records

v. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

w. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Device**;

2.     Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>A silver Apple iPhone 13, serial number 35981126362905,<br>currently located at the North Central High Intensity Drug<br>Trafficking Area, 801 West Michigan Street, Milwaukee, Wisconsin | ) ) ) ) ) ) Case No.22-1812M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(l), 846, 843(b); and 18 U.S.C. §§ 1956(a), 1956(h), 1957, 1035, 1347 | distribution of controlled substances and conspiracy; unlawful use of communications facilities; laundering of monetary instruments and conspiracy; false statements re: health care offenses; health care fraud |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

HIDTA TFO Robert Gregory
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means)*.

Date:11/9/2022 _____

_____
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Robert Gregory, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a state certified law enforcement officer employed as a Police Officer with the Milwaukee Police Department and have been a sworn officer in the State of Wisconsin for over eight years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area Milwaukee Metropolitan Drug Enforcement Group.  I am also case specific federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration for this investigation.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.      My responsibilities as a case specific TFO include the investigation of violent crimes, criminal enterprises, violations relating to the illegal sale and transfer of narcotics and firearms, and violent criminal acts in furtherance of criminal enterprises. In addition, my duties include the investigation of drug trafficking organizations (DTOs) and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957.  I have received specialized training in the means and methods by which individuals and DTOs conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking. I have also participated in multiple investigations involving illegal drug trafficking by DTOs. Additionally, I have received specialized training concerning the interception of wire and

electronic communications. I have also participated in these types of investigations and have listened to numerous intercepted calls.

3.     During my law enforcement career, I have participated in numerous narcotics investigations and have authored numerous affidavits supporting criminal complaints and search and seizure warrants. I have debriefed multiple defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. Based on my training, experience, and conversations with other law enforcement officers (LEOs), I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their methods used to distribute, transport, store, manufacture, and import controlled substances, their use of code words and numbers to conduct their transactions, their methods for concealing and safeguarding narcotics and narcotics proceeds, their methods used to launder narcotics proceeds, their use of violence and threats of violence to protect their organization, and the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. For example, I am familiar with their use of telephones, counter-surveillance, false and/or fictitious identities, and the use of coded language during conversations when referring to narcotics to disguise the true meaning of the conversation.

4.     Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes

2

(in the form of electronic data). Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software that are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

5. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

6. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

7. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THIS AFFIDAVIT

8. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a black Apple IPHONE SE, IMEI number 356844114703268, phone number (773) 948-2322, hereinafter "**the Device**," for evidence of violations of 21 U.S.C. § 841(a)(l) (distribution of controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy), 18 U.S.C. § 1035 (false statements regarding health care offenses), 18 U.S.C. § 1347 (health

care fraud), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), collectively referred to hereinafter as the **Target Offenses**. **The Device** is currently in law enforcement's possession and securely stored the at North Central High Intensity Drug Trafficking Area, 801 West Michigan Street, Milwaukee, Wisconsin

9.     The applied-for warrant would authorize the forensic examination of the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE: NARCOTICS DISTRIBUTION CONSPIRACY

10.     In January 2022, law enforcement officers in Milwaukee, Wisconsin, initiated an investigation into individuals distributing large quantities of controlled substances throughout Milwaukee, Wisconsin and elsewhere. Law enforcement officers identified Phillip DANIELS, SR. ("DANIELS") as the leader of the DTO. The investigation has revealed that DANIELS obtains large quantities of methamphetamine, heroin, fentanyl, cocaine, and marijuana from the DTO's sources of supply, at least one of whom is located in California. The controlled substances have been sent to Milwaukee, Wisconsin, and St. Paul, Minnesota, using the United Postal Service (UPS), FedEx, and/or United States Postal Service (USPS), and couriers drive the controlled substances from California to the Midwest United States at the direction and control of DANIELS. The DTO has established distribution locations in Milwaukee, Wisconsin; St. Paul/Minneapolis, Minnesota; and Chicago, Illinois.

11.     This knowledge is based on a variety of investigative techniques employed over the last ten months, including but not limited to physical and electronic surveillance, pen register and trap and trace records, interceptions of DTO parcels, interviews with

confidential sources, and Title III wire communications interceptions, including of **the Device**. An overview of some of the evidence gathered using these techniques is discussed below, with a focus on evidence that links DANIELS' use of **the Device** to his involvement in the DTO and **Target Offenses** in the later sections.

**A. Evidence Obtained Following the Arrest of Co-Conspirator Joelle MASSEY**

12.    On January 5, 2022, the residence located at 8708 N. Deerwood Drive, Brown Deer, Wisconsin, which was later determined to be associated with DANIELS, was searched pursuant to a federal search warrant after the U.S. Marshal Service arrived to execute a fugitive arrest warrant for someone wanted on state cocaine distribution charges and saw contraband in plain view. Joelle MASSEY, believed to be in a long-term dating relationship with DANIELS, was home at the time. MASSEY was permitted to call DANIELS, during which call they discussed whether officers would take the money in the residence. MASSEY was later arrested.

13.    Evidence seized during the search of this Brown Deer residence included the following:

> a.    Approximately 1,910 grams of methamphetamine in the kitchen/dining area, comprised of 1,885 grams, which was divided into 4 individual plastic bags, in one of several white plastic screw-on top containers, and approximately 25 grams packaged in 64 individual gem pack bags. Next to the white plastic containers was a shipping box with a circular imprint similar to the top of one of the white plastic containers. The shipping label was addressed to MASSEY with the address for the residence at 8708 N. Deerwood Drive, Brown Deer, Wisconsin, and the label indicated it was shipped by Michael Herrera, from an address in Los Angeles, California;

> b.    Approximately 2,767 grams of marijuana packaged in 10 individual vacuum sealed bags, a stun gun, and two medication bottles belonging to MASSEY in the bedroom;

5

c.      A plastic firearm box for a Glock, model 27, pistol in a kitchen cabinet;

d.      Three digital scales and empty gem pack bags in a kitchen drawer;

e.      $45,448 in U.S. currency believed to be drug proceeds;

f.      Personal identifying information for DANIELS throughout the residence, including DANIELS' social security card and his driver's license, which lists his address as 12605 W. North Avenue, 146, Brookfield, Wisconsin, a UPS store with numbered boxes for mail;

g.      Documents reflecting that (1) DANIELS held a Wells Fargo bank account and safety deposit box in St. Paul, Minnesota (which DANIELS and FRYER emptied on January 5, 2022); (2) two cashier's checks ($7,850 and $15,300) dated December 2021, drawn from DANIELS' Wells Fargo account to Joathan COLULA; (3) a deposit receipt dated December 15, 2021, reflecting a $9,010 deposit into DANIELS' Wells Fargo account (approximately $3,900 of the total deposit consisted of $20 bills, which case agents believe to be indicative of drug trafficking based upon their training and experience); (4) a $5,500 MoneyGram transfer receipt dated June 2021, wherein MASSEY sent U.S. currency from Minneapolis, Minnesota, to a liquor store in Los Angeles, California; and (5) rental agreements for various storage units held by DANIELS in Milwaukee, Wisconsin; and

h.      Hand-written drug ledgers wherein quantities of controlled substances, prices, and amounts paid were memorialized. Based on their training and experience, case agents believe that the controlled substances referred to included methamphetamine, cocaine, and different strains of marijuana.

14.      Pursuant to the search warrant, agents forensically extracted various devices seized from the residence. Located on an iPad were numerous pictures of DANIELS holding large quantities of U.S. currency.  Located on MASSEY's phone were communications between DANIELS and MASSEY related to their involvement in drug trafficking, including such topics as MASSEY carelessly allowing an unnamed male to "scam the pot" (meaning steal drugs) while she was supposed to be supervising this individual cooking crack cocaine, MASSEY growing the marijuana distribution side of

the DTO by investing in new strains and expanding their customer base, DANIELS asking MASSEY to sell "hard" or crack cocaine to an individual called "Domo" for redistribution, and DANIELS coaching MASSEY on cooking crack cocaine for the first time.

15.     The examination of MASSEY's phone further revealed that at various times, DANIELS would direct MASSEY to send, receive, or track DTO parcels. This included sending MASSEY names and address for the apparent purpose of having her ship drugs there. For instance, on October 25, 2020, during a layover in Charlotte, North Carolina (according to messages), DANIELS texted MASSEY, "234 Bates ave Saint Paul MN 55106. Send those last two hard to this address last name (Latrice SIMMS)." MASSEY indicated that there were no post offices open that day, but she would send the package the following day before flying out to meet him. The following day at 4 p.m., MASSEY texted DANIELS a photo of a receipt showing that she had mailed a padded envelope with next-day delivery guarantee to Saint Paul, Minnesota that day at 2:50 p.m.

**B. DTO Parcels**

16.     Between approximately October 7, 2021 and October 4, 2022, at least forty parcels suspected to contain controlled substances have been delivered to addresses associated with the DTO. These parcels have been identified as being associated with the DTO because the parcels have been traced to the same group of senders, and the listed recipients are often identified DTO members, to include DANIELS, MASSEY, Christopher DANIELS, Michelle HAUCK, or a few select other names, believed to be nominee names. The receiving addresses include, but are not limited to, the following:

a.     8708 N. Deerwood Drive, Brown Deer, Wisconsin: a residence

formerly shared by DANIELS and MASSEY;

b. 234 Bates Avenue, Saint Paul, Minnesota: a residence formerly shared by DANIELS and DTO co-conspirator Ramona FRYER. DANIELS has been observed at this residence, and court-authorized location information reflects that DANIELS was frequently in the area of this residence. DANIELS was listed as the utility holder at this residence from approximately April 2020 to April 2021;

c. 9905 W. Fond Du Lac Avenue, Milwaukee, Wisconsin: the residence of D.B. and K.B. D.B. and K.B.'s Medicaid information has been used by a home health care company, A Touch of Love Supportive Care Agency (ATOL), operated by DTO co-conspirator Roy HENTON, through which DANIELS laundered DTO proceeds;

d. 5234 N. Teutonia Avenue, Milwaukee, Wisconsin: a known stash house for the DTO;

e. 3259 N 48th Street, Milwaukee, Wisconsin: a vacant residence;

f. 6617 N 103rd Street, Milwaukee, Wisconsin: a vacant residence; and

g. 10018 W. Fond Du Lac Avenue, Milwaukee, Wisconsin: a residence directly next to DANIELS' former residence (10016 W. Fond Du Lac Avenue). DANIELS has been observed obtaining from this address parcels suspected of containing controlled substances on two occasions.

**C. March 2022 Seizure of Cocaine in Minnesota**

17. On or about March 3, 2022, case agents intercepted a package sent to FRYER's address in St. Paul, Minnesota. Specifically, the package was addressed to "K-Maree #E 234 Bates Ave., Saint Paul, MN 55106-5543." The package was shipped from "DXG Technologies 1001 S. Lawson St., City of Industry, CA 91748." On March 4, 2022, case agents searched this package pursuant to a federal search warrant. Located within the package was a white plastic dog food container with a screw off lid. The lid of the dog food container was glued shut, and expandable foam was on the exterior of the dog food container. Located inside the dog food container were packing peanuts, glue, expandable foam, and two plastic bags. The first plastic bag contained one large

8

rectangular object and the second plastic bag contained 2 large rectangular objects, which I know, based upon my training and experience, are consistent with the manner in which a kilogram of narcotics is packaged. The objects were tested for fingerprints with a negative result. A small sample of each suspected kilogram was subjected to the NARK II pouch 07 field test kit, and the result of the test was positive for cocaine. The total amount of cocaine seized was approximately 3,425 grams (1,135 grams, 1,145 grams, and 1,145 grams).

18.    Examination of financial information revealed that on February 23, 2022, Leroy HENTON (hereinafter "LEROY"), the son of co-conspirator Roy HENTON, made a cash deposit of $31,000 into a Wells Fargo account ending in x0363 affiliated with known DTO source Joathan COLULA. Additionally, FRYER made a cash deposit of $76,000 into COLULA's same account on the same day but from a different state than LEROY. Based on my training and experience, I know that there is normally a delivery cost associated with the shipment of cocaine and that a kilogram of cocaine would be worth approximately $25,000-$30,000. I further believe that the deposit amounts correspond to the approximately 3 kilograms of cocaine seized on March 3, 2022.

### D. Confidential Source of Information: CS 1

19.    Beginning in November 2021, a confidential source (CS), CS 1, made statements against CS 1's penal interest. CS 1 has an armed robbery conviction, two firearm convictions, and one federal narcotics trafficking conviction. CS 1 is cooperating in exchange for consideration on the federal narcotics trafficking conviction. Thus far, the information provided by CS 1 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the

investigation. More specifically, CS 1's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. CS 1's information has also been corroborated by digital evidence contained on CS 1's cell phone, such as text messages, photographs, and geolocation information. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS 1 is credible and CS 1's information reliable.

20.    In early 2021, the DEA and the Bureau of Criminal Apprehension in Minneapolis/St. Paul, Minnesota, were conducting a drug trafficking investigation in which approximately five pounds of methamphetamine, paraphernalia consistent with kilogram level distribution, and U.S. currency were seized from an individual later identified as CS 1.

21.    Beginning in November 2021, law enforcement conducted interviews of CS 1. CS 1 identified DANIELS by photograph as "Dr. Phil." CS 1 stated that CS 1 has known "Dr. Phil" since approximately September 2020. CS 1 stated that CS 1 sold multiple kilograms of cocaine, heroin, and methamphetamine for DANIELS and HENTON from approximately September 2020 to January 2021, in the Saint Paul/Minneapolis area. According to CS 1, the narcotics were shipped to Minnesota, and a typical shipment would contain six kilograms of cocaine, six kilograms of heroin, and approximately thirty pounds of methamphetamine.

22.    CS 1 indicated that DANIELS traveled via a commercial airline multiple times a month to see if people were ready for more controlled substances, i.e., resupply and/or collect money from his various runners who assisted the DTO. CS 1 stated that

DANIELS took these flights with U.S. currency inside of his luggage. CS 1 stated that DANIELS has also set up numerous LLCs, which DANIELS uses to get loans to move money. CS 1 indicated that DANIELS directed CS 1 to sell the narcotics, and DANIELS picked up the money at a later date. CS 1 indicated that if DANIELS did not pick up the money, CS 1 deposited drug proceeds into a Chase bank account under one of DANIELS' LLCs associated with a health care business, possibly "First Responsive Supportive Care." CS 1 provided a phone number for DANIELS in which CS 1 would call when more product was needed or if the money was ready for pick up. Officers were able to verify the phone number CS 1 provided was an old number used by DANIELS.

23. CS 1 stated that in July of 2020, DANIELS and others flew to California where CS 1 met them. CS 1 drove them around and picked items up for them. CS 1 observed DANIELS and two other individuals open their luggage and remove multiple freezer sealed bags with U.S. currency. CS 1 observed one of the subjects leave and come back with a money counter. CS 1 indicated that after the money was counted, CS 1 drove DANIELS and the others to a different location and dropped them off. CS 1 later picked up DANIELS and the others that same day after a short period of time.

24. CS 1 stated that in December of 2020, a Minnesota-based DTO member stole four kilograms of cocaine from DANIELS. Immediately thereafter, DANIELS and "Pops" (identified as HENTON) flew into Minneapolis to address the theft. CS 1 believed that HENTON was DANIELS' father (although the investigation reveals that HENTON is not DANIELS' father). According to CS 1, at this time, CS 1 met with DANIELS and HENTON regarding the price for cocaine. During the meeting, HENTON agreed to drop

the price of a kilogram of cocaine sold to CS 1 from $45,000 to $40,000 and advised CS 1 not to disclose the price with any other individual.

25.     CS 1 stated the organization was run by DANIELS.  However, CS 1 believed HENTON had the final say and ultimately was the "shot caller" based upon HENTON's ability to set pricing for cocaine.  CS 1 identified additional DTO subjects, to include Jameel BRADLEY SR., LEROY, CHRISTOPHER, and FRYER.

26.     CS 1 further stated that CS 1 had delivered narcotics to FRYER's residence located at 234 E. Bates Avenue, St. Paul, Minnesota.  According to CS 1, DANIELS instructed CS 1 to provide FRYER with pills and cocaine, which FRYER then distributed.

**E.  Confidential Source Information: CS 2**

27.     Beginning in January 2022, CS 2 made statements against CS 2's penal interest.  CS 2 has one federal narcotics trafficking conviction.  CS 2 is cooperating in exchange for consideration on the federal narcotics trafficking conviction.  Thus far, the information provided by CS 2 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation.  More specifically, CS 2's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 2 is credible and CS 2's information reliable.

28.     On or about January 16, 2022, a traffic stop was conducted on a black Nissan Altima (WA BYG7898) driven by an individual on I-15 near mile marker 71 in Summer, Utah.  The individual was later identified as a confidential source, CS 2.  During the traffic stop, CS 2's vehicle was searched after a drug detection dog alerted to the presence of the

scent of narcotics coming from the trunk of the car. The search revealed a white plastic container with a screw off lid containing seven brick-shaped objects, which field tested positive for seven kilograms of cocaine.

29.    Upon arrest, CS 2 stated that the car was rented by DTO co-conspirator Jameel BRADLEY SR. (confirmed by case agents) and that CS 2 did not know any controlled substances were inside the vehicle. CS 2 knows that BRADLEY SR. also goes by the nicknames of "Chris" or "Black." CS 2 stated CS 2 was driving the black Nissan first to Chicago, and then to Milwaukee, where CS 2 would be staying with MASSEY and meeting with friends.

30.    CS 2's phone was searched pursuant to CS 2's consent. Located in CS 2's phone extraction was a text message dated January 12, 2022, from (213) 444-9828, (TARGET TELEPHONE 2 below), which stated ". . . This Dr. Phil. Please give me a call." Based upon case agents' training, experience, and familiarity with this investigation, agents believe that DANIELS sent the message to CS 2 to inform CS 2 of his new phone number. Case agents know, based upon their training and experience, that it is common for drug traffickers to obtain new cellular telephone numbers to avoid detection by law enforcement officers. In this case, case agents believe that DANIELS changed his phone number to Target Cell Phone 2 after controlled substances, drug trafficking paraphernalia, and a large amount of U.S. currency were seized from his residence on January 5, 2022, less than two weeks earlier.

31.    CS 2 later provided additional statements to law enforcement. CS 2 stated that CS 2 transported drugs from California to Wisconsin approximately four or five

times at the direction of DANIELS and BRADLEY SR. CS 2 further stated that DANIELS and/or BRADLEY SR. hid the drugs within items such as a washing machine and furniture. According to CS 2, CS 2 was present at hotels in California with DANIELS and/or BRADLEY SR. when CS 2 observed rectangular-shaped objects wrapped in aluminum and/or brown tape. CS 2 stated that DANIELS and/or BRADLEY tampered with whatever item was used to transport the rectangular shaped objects, before loading the objects for transport. CS 2 further stated that DANIELS directed CS 2 to obtain items such as cleaning supplies, wipes, hand sanitizer, glue, and expandable foam. Based on my training, experience, and knowledge of this investigation, I believe that the rectangular-shaped items that CS 2 observed were kilogram quantities of controlled substances. I further know that kilogram quantities of narcotics are commonly wrapped in multiple layers of plastic along with multiple layers of tape, which is often done to conceal the controlled substance from a drug sniffing canine or from x-ray machines. Based on my training and experience, I also know that traffickers will commonly wipe the outside of the kilogram packages with items such as cleaning supplies to conceal the odor from a drug canine and/or to remove fingerprints from the packaging.

32. CS 2 described being present in Milwaukee with DANIELS, Christopher DANIELS, and Roy HENTON. CS 2 observed HENTON directing others what to do. As an example, on one occasion, CS 2 stated that HENTON told CHRISTOPHER to go to the "office," which CHRISTOPHER did. Upon his return, CS 2 observed CHRISTOPHER with white powder that he started cooking. I know, based on my training and experience, that it is common for drug traffickers to cook powder cocaine into "crack" cocaine.

### F. Confidential Source 3 Information: CS 3

33.     Beginning in April 2022, CS 3 made statements against CS 3's penal interest. According to law enforcement databases, CS 3 has one felony conviction for battery to a law enforcement officer and one misdemeanor battery conviction. CS 3 has open state cases for felony narcotic distribution charges and a Vehicle Operator Flee/Elude an Officer charge. CS 3 is cooperating in exchange for consideration on the open state charges and for monetary compensation. Thus far, the information provided by CS 3 has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the investigation. More specifically, CS 3's information has been corroborated by seizures of physical evidence, documentary evidence, and lawfully obtained device extractions. Moreover, CS 3's information has been corroborated by recorded phone calls. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe CS 3 is credible and CS 3's information reliable.

34.     CS 3 informed case agents that CS 3 is a client of A Touch of Love (ATOL), which CS 3 indicated is operated by HENTON and LEROY. CS 3 identified HENTON and LEROY by booking photographs. CS 3 stated CS 3 located ATOL by an advertisement in the Red Book at a corner store and that the advertisement offered assistance for those on Medicaid. CS 3 stated that ATOL receives Medicaid assistance money on behalf of CS 3. In addition to those payments, CS 3 is required to pay additional rent money in the amount of approximately $300 per month. CS 3 stated that ATOL has done very little to nothing in terms of providing personal or supportive care services to CS 3. Furthermore, CS 3 reported that CS 3 has purchased pills from LEROY. CS 3 further

reported that HENTON and LEROY have informed CS 3 that they have methamphetamine, cocaine, and heroin for sale.

### G. Controlled Calls Between CS 3 and DANIELS Using the Device

35. On September 18, 2022, under the direction and control of case agents, CS 3 contacted DANIELS on TARGET TELEPHONE 2 (213-444-9828) to schedule a controlled buy of a controlled substance. At 4:14 p.m., CS 3 called TARGET TELEPHONE 2 (verified by interceptions), and DANIELS answered the call. After greeting each other, CS 3 said, "Man! Um, my people be, um my people here, tomorrow, um the day after tomorrow. They wanted two, um..." DANIELS then interrupted CS 3 before CS three could finish the statement: "I'mma call you back and give you my number that you can call me on." At 5:10 p.m., CS 3 received a phone call from (773) 948-2322, which is the phone number associated with **the Device**. CS 3 spoke with a male he identified as DANIELS. Case agents were not with CS 3 during this phone call, however CS 3 did share a screenshot of their recent call history, which showed a phone call at 5:10 p.m. with **the Device**. CS 3 stated that during this call, CS 3 requested to purchase two and a half ounces of heroin from DANIELS, similar what CS 3 had begun to ask before DANIELS interrupted him during the earlier call ("They wanted two . . .").

36. On September 20, 2022, CS 3 placed a consensually recorded phone call to **the Device**, which was verified as case agents observed CS 3 dial **the Device**. Based upon intercepted communications over TARGET TELEPHONE 2 (discussed below), case agents knew the voice of the male that answered the call over **the Device** to be that of DANIELS. During this call, DANIELS stated, "All right, I'll be at you in a second. . . I want to make sure you, uh, get this going... Okay, real quick, I'm bringing you two zips

of H for them and then..." CS 3 responded, "No. No, it was two of the Barney and then the half of barney. Mine is separate from theirs." Based on their knowledge of this investigation, case agents believe that during this call, CS 3 asked to purchase two and one-half ounces of fentanyl ("Barney") from DANIELS. Case agents are aware that on an earlier date, DANIELS had provided CS 3 with a sample of fentanyl, which was purple in color, along with a price sheet for various narcotic drugs. Case agents believe that the drug referred to on that sheet as "Barney" was fentanyl, based on the color reference (that being the same as Barney the Dinosaur from the children's television show).

37.     At 3:31 p.m., case agents observed DANIELS meeting with CS 3. Shortly thereafter, CS 3 engaged in a controlled purchase of 66.47 grams of a substance that field tested positive for fentanyl (and was in "brick form") with DANIELS for $3,880. An audio recording of this meeting reflects that during this controlled purchase, DANIELS said, "It's hard to keep around... you follow me?" CS 3 replied, "Uh huh." DANIELS then said, "That real, authentic fentanyl [U/I]." Based on their training, experience, and knowledge of this investigation, case agents believe that DANIELS told CS 3 that he provided "real" fentanyl and that he has difficult keeping fentanyl around because it sells fast.

38.     These controlled calls with CS 3 were what originally informed law enforcement that DANIELS is the user of TARGET TELEPHONE 4/**the Device** and that he is using **the Device** to facilitate DTO activities.

### H. Title III Wire Communications Interceptions

39.     On August 24, 2022, United States District Judge J.P. Stadtmueller for the Eastern District of Wisconsin issued an order authorizing the initial interception of wire

communications related to this investigation over TARGET TELEPHONE 1, used by DTO co-conspirator Roy HENTON, and TARGET TELEPHONE 2, used by DANIELS. On August 24, 2022, case agents began intercepting wire communications over TARGET TELEPHONES 1 and 2. Interceptions ended on September 22, 2022.

40. On September 30, 2022, United States District Judge Pamela Pepper for the Eastern District of Wisconsin issued an order authorizing the continued interception of wire communications over TARGET TELEPHONE 1, used by HENTON; the continued interception of wire communications and the initial interception of electronic communications over TARGET TELEPHONE 2, used by DANIELS, the initial interception of wire communications over TARGET TELEPHONE 3, used by DTO co-conspirator Jameel BRADLEY SR; and the initial interception of wire and electronic communications over TARGET TELEPHONE 4, also used by DANIELS, which phone number was used by the **Device** I now seek to examine. On September 30, case agents began intercepting wire communications over TARGET TELEPHONES 1, 2, 3, and 4. Interceptions over TARGET TELEPHONE 3 ended on October 20, 2022, due to inactivity. Interceptions over TARGET TELEPHONES 1, 2, and 4 ended on October 29, 2022.

41. On November 3, 2022, United States District Judge J.P. Stadtmueller for the Eastern District of Wisconsin issued an order authorizing the continued interception of wire communications over TARGET TELEPHONE 2, used by DANIELS; the continued interception of wire communications over TARGET TELEPHONE 4 (the **Device**), used by DANIELS; and the initial interception of wire communications over TARGET TELEPHONE 5, used by DTO co-conspirator Jameel BRADLEY SR. On November 4, case

agents began intercepting wire communications over TARGET TELEPHONES 4 (**the Device**) and 5.  Due to a technological issue, case agents did not begin intercepting wire communications over TARGET TELEPHONE 2 until November 7.

42.     Interceptions on each of these lines have confirmed and expanded case agents' knowledge and understanding of DANIELS' DTO and the **Target Offenses**. Specifically pertinent here, numerous interceptions with TARGET TELEPHONE 4, which is connected to **the Device**, demonstrate that DANIELS is using **the Device** in furtherance of the **Target Offenses**.  A few recent examples are described in the sections that follow:

### i.  Communications with UM-0069

43.     On October 21, 2022, at 12:15 p.m., DANIELS, using **the Device**, received a call from and unknown male who was using phone number (718) 603-0069, (hereinafter "UM0069"). During the call, DANIELS complimented UM0069 regarding his improved ability to speak English.  UM0069 asked DANIELS, "Remember the Nike's that you're looking for?"  DANIELS responded, "Yes."  UM0069 said, "Um... I got them.  Well, I know somebody."   DANIELS asked, "Really?" DANIELS later asked, "Really good?" UM0069 responded, "Fire, fire, fire, fire, fire."  DANIELS asked, "What kind of number?" UM0069 stated, "Um... I think it's 20.  [Pause]  Two, zero. Two, zero." DANIELS asked, "Two, zero?"  DANIELS later stated, "That's a lot high for me."  UM0069 asked, "That's a little high?"  DANIELS responded, "Yeah, a little high for me."  UM0069 asked, "For real?" DANIELS said, "I get them at seventeen." DANIELS later said, "You know me... you know I'm a bigger player, so they gonna give me . . . so . . ." UM0069 stated, "Yeah." DANIELS continued, " . . . they bring 'em to me at, they bring to me ten, fifteen, twenty at a time." UM0069 responded, "Yeah... oh, damn. Because they give it to me for eight,

eight…one eight." Later, DANIELS stated, "I mean, if um... if you'll see if they'll , if they'll end up doing like seventeen five or something... you know, you can definitely put me on your line. . . . And I can buy them all the time." UM0069 responded, "Yeah, for sure; I have to speak with them, you know?" DANIELS then stated, "Yeah, just tell them who I am. . . . And let them know that I buy both, though; I buy that and I buy the... see if they got the um..." UM0069 said, "they probably got everything; whatever you need." DANIELS stated, "See if they have any seven hundreds or one thousands. Ask them, say: You all have a seven hundred or one thousand?" UM0069 responded, "Oh yeah, oh yeah, I got too. For sure." DANIELS replied, "Do you have a seven hundred or one thousand?" UM0069 stated, "Yeah." DANIELS said, "Right. Right." UM0069 replied, "Yeah, we definitely have the thousands. Nobody has thousands, but I think we have the thousands, too." DANIELS replied, "Okay, yeah. Okay, so… tell them that… fet-fet…" UM0069 stated, "Yeah, yeah… I know . . ." Later in the conversation, DANIELS asked, "And give me a good number on the…um… you know the window section?" UM0069 replied, "Yeah." DANIELS asked again, "That we used to look through? The window section." UM0069 replied, "Yeah, yeah, yeah. Yeah, yeah, for sure." DANIELS stated, "See if t hey can do a seven hundred a unit."  UM0069 questioned, "Yeah, seven hundred a unit? Oh, damn. Yeah."  DANIELS replied, "Yeah, on the window glass.  Yeah, yeah, yeah, so you know, the eye glass."  UM0069 later asked, "You don't got a number so I can send you a picture of what of . . ."  DANIELS replied, "This number, this number.  This my work line."  UM0069 stated, "All right, for sure."  DANIELS repeated, "This my work line."  UM0069 stated, "All right, this my good number, too.  You got, you got WhatsApp?"

DANIELS responded, "Yeah. Ask them if they, ask them can they ship." The UM replied, "Uh?" DANIELS repeated, "See if they can ship. If they can mail." UM0069 replied, "If they can mail? Oh, okay. All right, they probably, they probably want to, like little bit higher, you know." DANIELS said, "Okay, no, no, no, no, just see. If not, don't worry about it. No, no, no, no, don't worry about shipping. I have someone ship." UM0069 stated, "Okay."

44. Based on their training, experience, and knowledge of this investigation, case agents believe that during this call, UM0069 told DANIELS that he had a certain type of controlled substance that DANIELS was looking for. ("Remember the Nike's that you're looking for?" and "Um… I got them.") Case agents believe that "Nike" is code for a certain type of controlled substance, as they know drug traffickers use code words to make it harder for law enforcement to identify which specific controlled substances they are talking about. Further case agents believe that UM0069 told DANIELS that the product was pure and highly desirable. ("Fire, fire, fire, fire, fire.") When DANIELS later asked what the price of the "Nike" was, case agents believe UM0069 told DANIELS it was $20,000 ("20"). Based on their training and experience, case agents believe $20,000 is a common price for one kilogram of a controlled substance from a source state such as California. DANIELS stated that $20,000 was a high price for him (DANIELS), and DANIELS began to barter with UM0069 to get the price to drop.

45. Later in the conversation, case agents believe DANIELS and UM0069 discussed DANIELS' obtaining pills containing controlled substances, possibly fentanyl ("Okay, so… tell them that…fet-fet…") Case agents know that a current trend is fake

Oxycodone or Percocet pills. The pills actually contain the dangerous drug fentanyl. Case agents know that "fet" is a common slang term for fentanyl. Case agents further believe that DANIELS asked UM0069 whether he had a quantity of "seven hundreds" or "one thousands." Case agents also know that pills containing controlled substances are normally sold by the thousand.

46.     Based on their training, experience, and knowledge of this investigation, case agents further believe that DANIELS asked UM0069 to get him (DANIELS) a good price for crystal methamphetamine. Their belief is based on such statements or references as, "And give me a good number on the…um… you know the window section?;" "That we used to look through? The window section;" and "window glass." Case agents know that crystal methamphetamine is commonly referred to using code words such as "window" or "glass" based on the appearance of methamphetamine. Additionally, during a controlled delivery of controlled substances to CS 3, DANIELS referred to crystal methamphetamine as "sunglasses." Further, case agents believe that DANIELS asked UM0069 if he (DANIELS) could purchase a pound of crystal methamphetamine for $700 ("seven hundred a unit"). Case agents know that crystal methamphetamine is sold by the pound. Additionally, case agents believe that DANIELS asked UM0069 whether UM0069 could ship the controlled substances. ("Ask them if they, ask them can they ship." "See if they can ship. If they can mail.") Agents further believe that UM0069 told DANIELS that there would be a shipping cost if DANIELS wanted the controlled substances shipped. ("All right, they probably, they probably want to, like little bit higher, you know.") DANIELS then told the UM that he would not want to incur the

shipping costs and that he would have someone else ship them. ("Okay, no, no, no, no, just see. If not, don't worry about it. No, no, no, no, don't worry about shipping. I have someone ship.") Based on their knowledge of the investigation, case agents believe that DANIELS would have Deonte EDWARDS or another coconspirator procure the controlled substances and then have them personally shipped to DTO locations.

47. Finally, case agents observed that when UM0069 offered to send DANIELS a photo of the "eye glass" or crystal methamphetamine, DANIELS informed UM0069 that the phone number associated with **the Device** was his "work line," meaning the line he uses for narcotics transactions.

### ii. Communications with EDWARDS

48. On October 21, 2022, at 12:04 p.m., DANIELS, using TARGET TELEPHONE 4, called EDWARDS at (949) 513-9669. During the call, EDWARDS stated, "This... Morty, that... phones... I don't see how that shit work. That... shit don't work." DANIELS replied, "Right." EDWARDS stated, "Like, that... shit don't receive no calls but that motherfucker be calling." DANIELS affirmed, "Yeah." Later in the conversation, EDWARDS stated, "You know me; I keep that up already. Yeah, sir. We on that one." DANIELS replied, "Yeah. Go take care of your business and give me a call later if you need me." EDWARDS stated, "Okay, I got you. No, yeah... I'm packing shit up to just test some right now, 'bout to send it over, and shit...we'll be good."

49. Based on their training, experience, and knowledge of this investigation, case agents believe that EDWARDS told DANIELS that he (EDWARDS) was packaging controlled substances to later send them to DANIELS. ("I'm packing shit up to just test some right now, 'bout to send it over, and shit...we'll be good.") Furthermore, based on

intercepted communications between DANIELS and EDWARDS, case agents believe "Morty" is a California-based source of supply for controlled substances. Case agents have not been able to identify "Morty," however they know that DANIELS electronically sends cashier's checks and cash to EDWARDS, and EDWARDS thereafter immediately withdraws the money. Case agents believe that EDWARDS then gives the U.S. currency to California-based distributors, including "Morty," who in turn ship controlled substances to DANIELS or give the controlled substances to EDWARDS.

### iii. Communications with FRYER and UM6202

50. On October 22, 2022, at 7:58 p.m., FRYER, using (952) 381-1879, called DANIELS at TARGET TELEPHONE 4. FRYER asked, "It says 40 on it?" DANIELS replied, "Yeah." FRYER affirmed, "Okay." DANIELS stated, "Yup, that's it. He gonna give you a G too." The conversation ended shortly after.

51. Four minutes later, at 8:02 p.m., an unknown male (hereinafter UM6202) using (312) 776-6202 called DANIELS at TARGET TELEPHONE 4. UM6202 stated, "I'm outside, big bro." DANIELS replied, "Cool, she finna pull up in a white car." DANIELS later said, "So, yeah, she finna pull up. She finna pull up. She gonna let me know, she gonna be there in a few minutes. She gonna be in a white Honda." UM6202 stated, "I will…tell her I'm parked down…" DANIELS asked, "And you got that G for her, right?" UM6202 continued, "… in between two cars… I got a G for her? How much she gonna give me, Big Bro?" DANIELS responded, "No, no, no…she finna give you 40 g's of fentanyl."

52. Based on the timing of the above two described calls, as well as their training, experience, and knowledge of this investigation, case agents believe that

DANIELS instructed FRYER to meet with UM6202 to sell UM6202 40 grams of fentanyl. Case agents know that FRYER drives a white Honda Accord as case agents have observed FRYER driving this vehicle in the past. Case agents believe that UM6202 was going to pay $1,000 for the fentanyl up front. ("And you got that G for her, right?") Case agents know that traffickers commonly give buyers a controlled substance for a fraction of the total price, *i.e.*, they partially front the drugs, then collect the remaining sum owed after the buyer sells the product.

## PROBABLE CAUSE: MEDICAID FRAUD AND MONEY LAUNDERING

53.     To date, the investigation has revealed that HENTON, DANIELS, and other DTO members are laundering the proceeds of their drug trafficking ring and Medicaid fraud conspiracy through business accounts. More specifically, DANIELS and HENTON and others have funneled well over $2 million U.S. dollars in suspected drug proceeds through bank accounts that are held in the name of various supportive care agencies and that are also receiving Medicaid money from the State of Wisconsin.

54.     According to State of Wisconsin Medicaid records, the lawfully obtained forensic extraction of MASSEY's phone, and information obtained from CS 1, CS 3, and other witnesses that have made complaints to the Wisconsin Department of Health Services, DANIELS, HENTON, and an individual named Lenard MONROE purport to operate what are known as "supportive care agencies." State of Wisconsin healthcare fraud investigators indicate that these types of agencies have a high rate of fraud because they offer menial services to Medicaid recipients like cleaning their residence, laundry services, and transportation to medical appointments. These services do not need to be

performed by trained medical professionals. The agencies bill for these services by providing the Medicaid-recipient's Medicaid ID number and indicating that they and/or their employees/representatives performed these services for the Medicaid recipients. Based on representations, Medicaid remits payments for the services rendered.

55. According to State of Wisconsin healthcare fraud investigators, the Medicaid program is a government assistance program that is jointly funded by the states and federal government. It provides health care coverage to millions of Americans, particularly eligible low-income adults, children, pregnant women, elderly adults, and persons with disabilities. Furthermore, investigators are aware of the State of Wisconsin agencies involved in the administration of the Medicaid program in Wisconsin, including the Wisconsin Department of Health Services (DHS), and their various programs. DHS administers the Wisconsin Medicaid program on behalf of the State and federal government. It is headquartered in the city of Madison, Dane County, Wisconsin.

56. State of Wisconsin healthcare fraud investigators further know that DHS operates a Personal Care Agency program through Medicaid. A personal care agency is either a home health agency, county department, independent living center, American Indian tribe or band or a freestanding personal care agency that provides services that are:

     a. Medically oriented activities related to assisting an individual with activities of daily living necessary to maintain the individual in his or her place of residence in the community,

b.    Provided upon written orders of a physician by a certified personal care provider, and

c.    Provided by a personal care worker employed by the provider or under contract to the provider who is supervised by a registered nurse according to a written plan of care.

57.    When CS 1 was interviewed, CS 1 stated that HENTON advised CS 1 that HENTON "rounded up" "crackheads" and kept them "in line" by the group. According to CS 1, HENTON's and DANIELS' clients were in some cases provided narcotics and were also sometimes forced to log hours to make the health care businesses appear legitimate to the government. CS 1 believed the health care businesses were a scheme to fraudulently collect money from government and government programs. Additionally, contained within CS 1's telephone was an employment letter DANIELS sent to CS 1 via text, which letter indicates that CS 1 was accepted for full-time employment with ATOL. In the letter, DANIELS indicated that he was the "Chief operating officer" of ATOL. CS 1 indicated that DANIELS wrote this letter only so that CS 1's court-ordered travel restrictions would be lifted so that CS 1 could travel other areas of the United States to sell narcotics.

58.    HENTON, DANIELS, and other DTO members, including MONROE and Betty DANIELS (DANIELS' ex-wife), have all received significant deposits from State of Wisconsin Medicaid and electronic deposits from the State of Wisconsin IRIS (Include, Respect, I Self Direct) program, which is part of the Wisconsin Medicaid program. Many

of these accounts also received cash deposits during the same time period as the Medicaid deposits.

59.     DANIELS and Betty DANIELS are co-signors on bank accounts in the name of First Response Supportive Care Agency (FRSC) at Chase Bank and BMO Harris Bank (hereinafter referred to as the FRSC bank account). The FRSC bank account received approximately $995,000 in cash deposits from approximately June 2020 through December 2020. During this same time frame, approximately $1,200,000 in cash was withdrawn from this account, with many of the withdrawals being conducted by DANIELS while in California. Additionally, there does not appear to be any outgoing checks consistent with regular company payroll. From approximately January 2019 through October 2021, the FRSC bank account electronically received approximately $333,000 from Wisconsin Medicaid.

60.     According to CS 1, at the direction of DANIELS, CS 1 deposited the proceeds from narcotics sales conducted by CS 1 into a Chase bank account controlled by DANIELS. Bank records reflect that CS 1 deposited drug proceeds into the FRSC bank account on at least three occasions, and the deposits totaled approximately $102,335. The individual deposits exceeded $10,000 U.S. currency. CS 1 also stated that CS 1 eventually stopped depositing drug proceeds in the FRSC controlled account, and instead, personally gave the drug proceeds to DANIELS.

61.     HENTON is the owner/operator of ATOL. HENTON opened a bank account ending in 413_08 at Educators Credit Union (ECU) in the name of ATOL on or about January 1, 2018. From that date until March 17, 2021, HENTON was the sole signer

for this account. On March 18, 2021, DANIELS was added as an additional signer. From approximately January 1, 2018, to October 20, 2021, this account received approximately $1,100,000 in Medicaid money from the State of Wisconsin. During the same time frame, HENTON conducted approximately $953,902 in cash withdrawals from this account. ECU records reflect that upon receipt of a Medicaid deposit, withdrawals in the amount of the deposit, a significant percentage of the deposit, or more than the amount of the deposit would occur.

62.     Further analysis of the account ending in 413_08 showed that ATOL did not use any payroll service to pay potential employees and did not have consistent payroll checks being debited to employees. According to the Wisconsin Department of Workforce Development, ATOL has no reported wages. Additionally, records reflect that approximately 67% of the total funding for the account came from the deposits from Wisconsin Medicaid. Approximately $253,000 in cash was deposited into this account from January 1, 2018, to October 23, 2021, accounting for 15% of the total deposits. Moreover, because Medicaid money was received via electronic deposits on the behalf of Medicaid recipients, the recipients of purported healthcare services would not pay ATOL in cash. Accordingly, it appears that a bank account in the name of ATOL has been used to launder drug proceeds and to facilitate healthcare fraud.

63.     HENTON and DANIELS also opened up bank accounts ending in 1789 and 3484 at Associated Bank in the name of the business Intelligent Investments. These two accounts were opened in January and February 2019 and were closed in August and September 2020, respectively. The account ending in 1789 received $135,749.59 in cash

deposits (accounting for 67% of incoming funds) and the account ending in 3484 received approximately $95,892.01 in cash deposits (accounting for 86% of incoming funds). Analysis of these accounts indicate that these Intelligent Investment accounts did not appear to operate as any type of legitimate business.

64. MONROE is listed as the Registered Agent of Wellness Personal Care Service (WPCS). According to the State of Wisconsin Medicaid records, WPCS received at least $5,000,000 from approximately January 2019 to the present. Complete bank records for WPCS are still pending, but records received so far have shown WPCS has paid FRSC, in the form of 77 checks, approximately $860,000 from September 2020 through December 2021. These checks often reflect "consulting" or "payroll" in the memo line. However, employment wage earnings checked with the State of Wisconsin do not show any wages being paid to DANIELS/FRSC.

65. Multiple individuals for whom ATOL has billed Medicaid for services rendered have said that ATOL, and other associated businesses, provided no services to them and that HENTON and DANIELS have stolen their IRIS money designated for them.

66. For example, when interviewed, CS 3 stated that ATOL (HENTON) and WPC (MONROE) never provided any supportive or personal care services to CS 3, and CS 3 never signed any time sheets (which are required to be completed by the personal or supportive care worker and signed by the client). According to Medicaid records from the State of Wisconsin, since January of 2020, ATOL and WPCS billed for services rendered to CS 3 and received payments of approximately $24,580 and $44,700,

respectively from the State of Wisconsin Medicaid for those purported services. CS 3 did not provide documentation showing CS 3 was a client of ATOL or WPCS, but Medicaid billing information provided by the State reflects that ATOL and WPCS used CS 3's name and personal identifying information to bill Medicaid.

67. Witness 2 was interviewed and provided a similar statement to law enforcement. According to Medicaid records from the State of Wisconsin, ATOL and WPCS billed for services rendered to Witness 2 and received payments of approximately $15,000 and $23,000, respectively, for those purported services. According to Witness 2, the personal and/or supportive care services were never fully provided. Witness 2 was interviewed after having previously lodged a complaint against the involved individuals/agencies to the Wisconsin Department of Health Services. Witness 2 is no longer a client of ATOL or WPCS.

68. Witness 3 was interviewed and stated that HENTON and DANIELS signed Witness 3 up for IRIS services, but they did not provide any personal and/or supportive care services. According to Medicaid records from the State of Wisconsin, WPCS billed for services to Witness 3 and received payments of approximately $68,000 for those purported services. Witness 3 was interviewed after having previously lodged a complaint against the involved individuals/agencies to the Wisconsin Department of Health Services. Witness 3 is no longer a client of ATOL or WPCS.

69. Additionally, DANIELS has used the residences of individuals for which the DTO has received Medicaid funds to receive parcels containing suspected controlled substances. More specifically, D.B. and K.B. have received packages containing

suspected controlled substances for DANIELS. According to Medicaid records from the State of Wisconsin, WPCS and ATOL billed for services rendered to D.B. and K.B. and received payments of approximately $120,000 and $135,000, respectively, for those services.

## NOVEMBER 8, 2022 RECOVERY OF THE DEVICE

70.     On November 7, 2022, DANIELS booked a flight from Chicago, Illinois (O'Hare International Airport) to Los Angeles, California (Los Angeles International Airport).  DANIELS arrived at O'Hare at 12:12 p.m. and boarded his flight a short time later.  GPS data from **the Device** showed it near Terminal 3 of O'Hare airport from the time DANIELS entered the airport through DANIELS departing to California.

71.     GPS data continued to show **the Device** near Terminal 3 of O'Hare airport in the morning on November 8, 2022.  Case agents also noticed a decrease in trace and trace data after DANIELS left O'Hare Airport.

72.     On November 8, at 11:43 a.m., DANIELS, using TARGET TELEPHONE 2, called BRADLEY SR. on TARGET TELEPHONE 5 (708-635-3573).  During the phone call, BRADLEY SR. informed DANIELS, "Hey, Mello looking for you."   DANIELS replied, "All right.  You know what?  He was on my other phone I don't… I lost my phone, bro." Based on the GPS data from **the Device,** decreased trap and trace data from **the Device**, and DANIELS stating, "I lost my phone, bro," case agents concluded that DANIELS had lost **The Device** while in O'Hare International Airport.

73.     Case agents contacted members of the Drug Enforcement Agency (DEA) who work at O'Hare International Airport regarding **The Device** being lost near Terminal 3.  Agents contacted airport staff who found **the Device** in the Check Point 8

security line for Terminal 3. Case agents verified that **the Device** was indeed DANIELS' lost phone by dialing (773) 948-2322 and observing that **the Device** rang.

74. Case agents believe based on their training and experience that evidence of controlled substance trafficking will be located in **the Device**. Case agents believe that information located in **the Device** will help case agents understand the full scope of the DTO, including customers and suppliers.

75. **The Device** is currently in storage at 801 West Michigan Street, Milwaukee, Wisconsin. In my training and experience, I know that **the Device** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when **the Device** first came into the possession of HIDTA.

76. Based on their training, experience, and knowledge of this investigation, case agents believe that **the Device** contains evidence of the **Target Offenses**.

## TECHNICAL TERMS

77. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard

drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

78.      Based on my training and experience, I know that **the Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used **the Device**.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

79.      Based on my knowledge, training, and experience, I know that electronic devices—like **the Device**—can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on such devices. This information can sometimes be recovered with forensics tools.

80.      *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as

direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **the Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **the Device** because:

> a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

> b.      Forensic evidence on a device can also indicate who has used or controlled that device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

> c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

> d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

> e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

81.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **the Device** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium,

that might expose many parts of **the Device** to human inspection in order to determine whether it is evidence described by the warrant.

82.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

83.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **the Device** described in Attachment A to seek the items described in Attachment B.

**ATTACHMENT A**
**PROPERTY TO BE SEARCHED**

The property to be searched is a silver Apple iPhone 13, serial number 35981126362905, hereinafter "**the Device**," which is currently located at North Central High Intensity Drug Trafficking Area, 801 West Michigan Street, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of **the Device** for the purpose of identifying the electronically stored information described in Attachment B.

<u>**ATTACHMENT B**</u>

1.        All records on **the Device** described in Attachment A that relate to violations of 21 U.S.C. § 841(a)(l) (distribution of controlled substances), 21 U.S.C. § 846 (conspiracy to distribute controlled substances), 21 U.S.C. § 843(b) (unlawful use of communications facilities), 18 U.S.C. §§ 1956(a), 1956(h), and 1957 (laundering of monetary instruments and conspiracy), 18 U.S.C. § 1035 (false statements regarding health care offenses), 18 U.S.C. § 1347 (health care fraud), and 18 U.S.C. § 2 (aiding and abetting the aforementioned offenses), and involve Phillip DANIELS, including, but not limited to:

    a.   Lists of drug customers and related identifying information;

    b.   Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   Any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

    d.   Any information recording schedule or travel;

    e.   All bank records, checks, credit card bills, account information, and other financial records;

    f.   Photographs and/or video depicting possession of drugs, firearms, assets, or other activities related to drug trafficking or money laundering;

    g.   Any evidence related to either the ownership, purchase, or possession of drugs, firearms, and assets;

    h.   Personal or supportive care client files, including but not limited to the complete client files, prescription records, medical reports, notes of medical personnel and staff members, office notes, progress notes, medical examination notes, medical diagnoses, appointment records, patient sign in sheets, billing records, test results, laboratory tests and results, photographs, x-rays, physician orders, history and physical

forms, treatment plans, referrals, consultations, correspondence, client contracts, client information, demographic information, and certificates of medical necessity;

i.  Records reflecting any polices or procedures of the businesses/agencies, including but not limited to billing and training policies and procedures;

j.  Records or other evidence of client complaints, allegations of substandard care and performance, and unnecessary services performed by representatives, employees and agents of the agencies;

k.  Records related to employees, consultants, and personnel including but not limited to resumes, application forms, licenses, job descriptions, time sheets, employment agreements, management reviews, hiring records, termination records, contracts, IRS Forms 1099 and W-2, cancelled checks, expense reimbursement documents, and credit card receipts for all current and former owners, officers, employees and independent contractors.

l.  Communications in any form involving current and former business/agency owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial services providers, potential or actual clients, insurance companies, consultants, or government entities to the extent the communications may relate to the crimes under investigation. This includes communications between any employees of the agency and the agency itself and communications between and among any of the entities referred to herein.

m.  Audio or video recordings, stored in any format, of communications between, or statements of, current and former business/agency owners, officers, employees, independent contractors, vendors, affiliates, referral sources, financial service providers, potential or actual clients, and consultants;

n.  Contracts with any current or former clients, vendors, affiliates, referral sources, independent contractors, or consultants;

o.  Records that tend to show the activities, location, or compensation of current and former agency owners, officers, employees, independent contractors, consultants, or referral sources, including calendars, schedules, appointment books, timesheets, or address books; compensation agreements and payments; or documentation related to purchase or other transfer of assets;

p. Corporate records, including meeting minutes, strategic planning documents, financial projections and budgets, organizational charts, or other records reflecting corporate decision-making and responsibilities;

q. Financial records reflecting the earnings, income, profits, and assets of the businesses/agencies and its owners and corporate officers and directors, including: bank statements, bank books, certificates of deposit, wire transfers, cashier's checks, money orders, currency exchange receipts, check books, brokerage and investment account records, stock certificates, credit cards, credit card statements, tax returns, tax return information, appraisal documents, title documents, safe deposit box keys, storage facility keys, and documents evidencing account members and financial assets of the clinic and its owners and corporate officers and directors;

r. Cash, money orders, or other forms of payment, stored in any location, which represents proceeds from the illegal conduct described herein;

s. Items reflecting the use of file-sharing technology (not to include contents of files shared that are not otherwise within the scope of this attachment);

t. Records identifying other locations where the businesses/agencies may maintain financial, medical, and billing records, such as additional office space or storage units;

u. All bank records, checks, credit card bills, account information, and other financial records

v. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

w. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of the **Device**;

2. Evidence of user attribution showing who used or owned the **Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.